# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE-OPELOUSAS DIVISION

DAVID ANTHONY BATISTE        CIVIL ACTION NO. 06-0166

VS.        JUDGE DOHERTY

COMMISSIONER OF SOCIAL SECURITY        MAGISTRATE JUDGE METHVIN

## <u>REPORT AND RECOMMENDATION</u>

_____Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be **REVERSED**.

### *Background*

Born on June 10, 1988, David Batiste ("Batiste") is currently 18 years old. Batiste began receiving Supplemental Security Income benefits effective July 30, 1991, based upon a finding that he met the mental retardation listing of §112.05E2, and had additional developmental delays.[1] In 1999, SSA terminated benefits following a periodic review. An administrative hearing was held on June 6, 2001.[2] On September 27, 2001, the ALJ issued a decision finding that Batiste was no longer disabled.[3] Batiste appealed the decision to the Appeals Council, which denied review, making the ALJ's decision the final decision of the Commissioner from which Batiste now appeals.

---

[1] Tr. 69.

[2] Tr. 24-49.

[3] Tr. 14-22.

### *Standard of Review*

This court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Id.; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991).  The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion.  Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir.1988).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision.  Id.

### *Childhood Disability Benefits*

An individual under age 18 may be found disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §1382c(a)(3)(C)(i).

The regulations provide a three-step sequential evaluation process for determining whether a child's impairments result in "marked and severe limitations."  First, if the child is engaging in "substantial gainful activity," the child will be found not disabled regardless of medical condition or age, education, or work experience.  20 C.F.R. §416.924(b).  Second, the child must have a severe impairment or impairments.  If the child suffers from a slight abnormality or a combination of slight abnormalities that causes no more than minimal

functional limitations, the child will be considered to have no severe impairment, and therefore to be not disabled. Title 20 C.F.R. §416.924(c). Third, the child will be considered disabled if his or her impairment(s) meet, medically equal, or functionally equal in severity a listed impairment in Appendix 1 of Subpart P of Part 404 of the chapter. If a child's impairments do not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairments to determine whether the functional limitations are disabling. 20 C.F.R. §§ 416.926a (functional equivalence for children). *See*, *e.g.*, <u>Luckerson v. Apfel</u>, 2000 WL 1222125 (N.D. Ill. Aug. 22, 2000).

In the Benefits Review Act of 1984, 42 U.S.C. § 423(f), Congress established specific standards for the termination of disability benefits. Pursuant to these standards, the Secretary may terminate disability benefits if substantial evidence demonstrates that: (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (B) the individual is now able to engage in substantial gainful activity. *See* § 423(f)(1); <u>Griego v. Sullivan</u>, 940 F.2d 942, 944 (5th Cir.1991).

The Commissioner bears the burden of proving that the disability benefits should be terminated. <u>Id.</u>, 940 F.2d at 944.

The implementing regulations define a medical improvement as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A determination of medical improvement "must be based on changes (improvement) in the symptoms, signs, and/or laboratory findings associated with your

impairment(s)." And a medical improvement is only related to an individual's ability to work "if there has been a decrease in the severity ... of the impairment(s) present at the time of the most recent favorable medical decision and an increase in your functional capacity to do basic work activities." 20 C.F.R. § 404.1594(b)(3).

### *ALJ's Findings*

The ALJ found that Batiste had the following severe impairments: learning disability with language and speech delays, bipolar disorder, and borderline intellectual functioning.[4]  The ALJ compared Batiste's current condition to his condition at the time of his favorable disability determination and concluded that Batiste had medically improved and that he no longer met the requirements for mental retardation:

> The evidence reveals that at the time of the comparison point decision the claimant's impairment met Listing 112.05-E because intelligence testing revealed scores within the mental retardation range due to microchephalus at birth. Evidence revealed, at thirty-months of age, he had the age equivalence of twenty-two months.
>
> ***
>
> Applying the analysis set forth above, the Administrative Law Judge finds that there has been medical improvement in the claimant's condition since the time of his comparison point decision in 1991 and no exception of the medical improvement standard applies. The Administrative Law Judge further finds that while the claimant continues to suffer from severe impairments in the form of borderline intellectual functioning, learning disability with language and speech delays, and a bipolar disorder, he no longer meets or equals any listing which had previously been met or equaled.  His current intellectual functioning scores are 71, 75, and 83, which are within the borderline range.  These scores do not meet the criteria of any listing previously met.  He was originally awarded benefits because he did not verbally respond.  Currently he is being promoted to the seventh grade and is in special education classes.  There is no indication of lack of communication from his teachers or parents, nor was this indicated at the hearing.

---

[4] Tr. 18.

The current medical evidence reveals his impairments or combinations of impairments do not meet or equal any listing in the listing of impairments.[5]

The ALJ then assessed whether Batiste's impairments functionally equal a listed impairment. The ALJ determined that Batiste had a less than marked degree of limitation in the domains of acquiring and using information and attending and completing tasks, and no limitation in the domains of interacting and relating with others, moving about and manipulating objects, caring for your self, and health and physical well-being.[6] The ALJ, therefore, found that Batiste was no longer disabled.

### *Assignment of Errors*

Batiste contends that the ALJ erred in finding that Batiste's benefits were properly ceased.

### *Findings and Conclusions*

## I.      **Administrative Record**

Batiste was born with microcephaly (small head) and had developmental delays. On May 9, 1991, at the age of three, Batiste was diagnosed with "mild to moderate mental retardation."[7]

The record shows that Batiste was "promoted according to the Pupil Progression Plan in first grade."[8] Batiste failed third grade. In November, 1998, at the age of 10 and in fourth grade, Batiste was referred to Lafayette Parish School Board Special Education Department for

---

[5] Tr. 16-18.

[6] Tr. 20.

[7] Tr. 178.

[8] Tr. 220.

evaluation due to poor academic functioning and communication concerns.[9]  It was noted that

Batiste was in speech/language therapy.  The school system determined that based on Batiste's

test results and interviews, he was functioning in the "low average to below average range."[10]

Batiste's test results were as follows:

### Woodcock-Johnson Test of Educational Achievement-Revised

|  | Grade Equivalent | Standard Score | Percentile |
|---|---|---|---|
| Broad Written Language | 1.8 | 68 | 2 |
| Dictation | 1.7 | 71 | 3 |
| Writing Samples | 2.0 | 79 | 8 |

### Wechsler Individual Achievement Test

|  | Grade Equivalent | Standard Score | Percentile |
|---|---|---|---|
| Broad Reading | 1.7 | 71 | 3 |
| Basic Reading | 1.9 | 76 | 5 |
| Reading Comp. | 1.8 | 70 | 2 |
| Broad Mathematics | 2.6 | 83 | 13 |
| Numerical Operations | 3.1 | 81 | 10 |
| Mathematics Reasoning | 3.3 | 89 | 23 |
| Spelling | 1.7 | 69 | 2 |

The school system classified Batiste as learning disabled, with a secondary classification

of speech impairment.[11]  Batiste was placed in "resource with regular classes" because of his

need for a small group setting.

---

[9] Tr. 204.

[10] Tr. 210.

[11] Tr. 220.

The Individualized Education Program ("IEP") dated May 3, 1999 provides that Batiste was to have tests read aloud, with additional time for tests, repeated directions, shortened assignments, preferential seating, and additional instruction on social skills.[12]

On August 2, 1999, at the request of Disability Determination Services ("DDS"), Batiste underwent a psychological evaluation by Dr. Alfred Buxton, a clinical psychologist.[13]  On the Wechsler Intelligence Scale for Children-III, Batiste achieved a verbal IQ of 71, performance IQ 83, and full scale 75.  Dr. Buxton noted the difference between the performance and verbal scores, stating that, "This is felt to be both statistically and clinically significant.  He is more proficient in the psychomotor or non-verbal domain than he is in the language or verbal domain."[14]  This is consistent with his history of learning disability primarily impacting his verbal and language domain.  Dr. Buxton found Batiste to function "in the significantly subaverage general intellect with skills going up to the dull normal or low average range when one focuses on the psychomotor or non-verbal domain."[15]

A non-examining psychological consultant, R.H. Ralston, Ph.D., completed a Childhood Disability Evaluation Form on October 4, 1999.[16]  Dr. Ralston reported that Batiste's learning disability, expressive language disorder, and adjustment disorder are severe, but do not meet or functionally equal a listed impairment.  Batiste reportedly had no limitations in the areas of

---

[12] Tr. 223.

[13] Tr. 235-239.

[14] Tr. 236.

[15] Tr. 237.

[16] Tr. 240.

"motor," "social," "personal attainment," and "concentration, persistence, or pace," and less than marked limitation in "cognitive/communicative." Dr. Ralston concluded that Batiste's impairments had medically improved since he was awarded disability benefits in 1991.

On October 25, 1999, Dr. Phillip LaFleur, a child psychiatrist, examined Batiste. Batiste reported having problems with depression and attention and concentration. He was prescribed Adderall for attention deficit disorder ("ADD"). Dr. LaFleur noted that recently Batiste "has had problems with his hygiene and grooming, has been socially withdrawn and isolative, he has been resisting school, has been having severe crying spells, and has been having trouble learning, concentrating, and focusing in school."[17] Dr. LaFleur noted that Batiste had a learning disability and became very depressed when he was unable to do school work that other students his age could do.[18] Batiste was prescribed an antidepressant.

In May, 2000, Batiste was reevaluated by the school system.[19] He was found to be at the fourth grade level in broad written language. He could spell on a third grade level.[20]

On January 26, 2001, Dr. LaFleur noted:

> I have been following David since August 1999. Since that time, David has had consistent cyclical mood swings. David has periods of time where he becomes quite depressed and has been suicidal. In addition, he has periods of time where it has become apparent that he exhibits some manic symptoms. David has been very silly, having trouble sleeping and is having a great deal of trouble concentrating in school. His medicines have been minimally effective for him to this point, because the presumption was that he had attention deficit hyperactivity disorder with depression. In actuality, it appears that David has bipolar disorder.

---

[17] Tr. 303.

[18] Tr. 303.

[19] Tr. 264-270.

[20] Tr. 263.

I saw David yesterday, January 25, and will begin him on Lithium. David will likely continue to need medication, as you know bipolar is a chronic illness. It is frequently only partially controlled, and it is likely that David will continue to have a need for therapy as well as medication management. Without medications at this time, David is having marked difficulty in school with being able to focus and concentrate. He is unable to function in a social setting because of his behavior, and despite normal intelligence, David is not doing well in his classes. It is my opinion that David most likely would be considered disabled at this point.[21]

Although Dr. LaFleur referred to Batiste's intelligence as "normal" in this report, the record shows that Dr. LaFleur did not have access to Batiste's repeated IQ scores, which show that Batiste functions well below that of normal intelligence. Furthermore, as indicated, Dr. LaFleur concluded that Batiste was disabled due to other mental impairments, including bipolar disorder and depression.

On July 25, 2001, Batiste was reevaluated by Dr. Buxton.[22] Batiste's ability to attend and concentrate was good, pace was even, intellect was subaverage, and insight was poor. Batiste's Wechsler Intelligence Scale for Children-III scores were: verbal IQ of 70, performance IQ 77, and full scale 71. Dr. Buxton found that Batiste functioned in the significantly subaverage general intellect with skills going up in psychomotor or non-verbal domain. Dr. Buxton stated that Batiste's "[a]daptive daily living skill development is regarded as existing in the dull normal or low average range of functioning. Level of competency is a bit subaverage but within acceptable limits of calendar age expectancy."[23]

---

[21] Tr. 259.

[22] Tr. 297-299.

[23] Tr. 299.

On September 14, 2005, Batiste was examined by Dr. Daniel Escalona, a psychiatrist.[24] Batiste's chief complaints were depression, mood swings, and anger issues. Batiste explained that he sometimes got so angry he cried, he punched walls, threw a desk at school, and that he does not have hope. Batiste did not have friends, stayed to himself, and "blames his mother for having him."[25] He was not suicidal. Dr. Escalona concluded that Batiste had bipolar disorder. Batiste was prescribed Zoloft (anti-depressant), lithium (for bipolar disorder), and Zyprexa (for bipolar disorder).[26]

Batiste returned to Dr. Escalona on October 5, 2005.[27] Batiste reported that he had an angry outburst the day before the visit. He cried for no reason, had no hope, and felt that he does not belong. Dr. Escalona increased the dosage of Zoloft and told Batiste to continue taking the medication prescribed for the bipolar disorder.

## II.    Listing under § 112.05D

As discussed above, the ALJ determined that Batiste no longer met the requirements for mental retardation, i.e., § 112.05D. The undersigned concludes that substantial evidence does not support the ALJ's decision regarding medical improvement of Batiste's mental impairments.[28]

---

[24] Tr. 306.

[25] Tr. 308.

[26] See http://www.zyprexa.com/index.jsp

[27] Tr. 310.

[28] In the Benefits Review Act of 1984, 42 U.S.C. § 423(f), Congress established specific standards for the termination of disability benefits. Pursuant to these standards, the Secretary may terminate disability benefits if substantial evidence demonstrates that: (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (B) the individual is now able to engage in substantial gainful activity. *See* § 423(f)(1); Griego v.

§ 112.05 provides, in part:

112.05 Mental Retardation: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive behavior. * * *

The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied. * * *

(D) A valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function.

Dr. Buxton found Batiste to have "significantly subaverage general intellect" with "[a]daptive daily living skill development is regarded as existing in the dull normal or low average range of functioning. Thus, Batiste meets the introductory paragraph of § 112.05, which requires "significantly subaverage general intellectual functioning with deficits in adaptive behavior."

In order to be valid, an IQ test must be current. Section 112.00D explains the requirements for a valid IQ score:

10. IQ test results must also be sufficiently current for accurate assessment under 112.05. * * * IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above.

Here, the August, 1999 scores relied upon by the ALJ are not valid because they were not current at the time of the ALJ's decision in September, 2001. Rather, the IQ scores dated

---

Sullivan, 940 F.2d 942, 944 (5th Cir.1991).

The implementing regulations define a medical improvement as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A determination of medical improvement "must be based on changes (improvement) in the symptoms, signs, and/or laboratory findings associated with your impairment(s)." And a medical improvement is only related to an individual's ability to work "if there has been a decrease in the severity ... of the impairment(s) present at the time of the most recent favorable medical decision and an increase in your functional capacity to do basic work activities." 20 C.F.R. § 404.1594(b)(3).

July 25, 2001 are the valid scores which should have been used by the ALJ. Batiste's scores

were: <u>verbal IQ of 70</u>, performance IQ 77, and full scale 71.[29]

Paragraph 9 of § 112.00D states:

*** In cases where more than one IQ is customarily derived from the test
administered, e.g., where verbal, performance, and full scale IQs are provided in
the Wechsler series, the lowest of these is used in conjunction with listing 112.05.

Thus, Batiste meets the first requirement of a listing impairment under §112.05(D), i.e.,

he has a valid IQ score that fall within the range 60 through 70.

The second prong of §212.05(D) requires "a physical or other mental impairment

imposing an additional and significant limitation of function."  The impairment need not be

disabling in itself.  § 112.00A defines "significant limitation of function":

Listing § 112.05 (Mental Retardation) contains six sets of criteria.  If an
impairment satisfies the diagnostic description in the introductory paragraph and
any one of the six sets of criteria, we will find that the child's impairment meets
the listing. **For listings 112.05D and 112.05F we will assess the degree of
functional limitation the additional impairment(s) imposes to determine if it
causes more than minimal functional limitation, i.e., is a 'severe'
impairment(s), as defined in § 416.924(c).**

"[A]n impairment can be considered as not severe only if it is a slight abnormality which

has such minimal effects on the individual that it would not be expected to interfere with the

individual's ability to work, irrespective of age, education, or work experience."  <u>Estran v.

Heckler</u>, 745 F.2d 340, 341 (5th Cir.1984); <u>Anthony v. Sullivan</u>, 954 F.2d 289, 293 (5th Cir.1992).

Here, the ALJ specifically found that Batiste's bipolar disorder is a severe impairment.

Moreover, it is clear that Batiste's bipolar disorder affects his ability to function – it causes him

---

[29] Tr. 297-299.

to be depressed, cry without reason, have angry outbursts, feel despondent, and to have cyclical mood swings.

Considering that Batiste has a verbal IQ of 70 and a bipolar disorder which imposes additional and significant limitations, the undersigned finds that substantial evidence does not support the ALJ's finding that Batiste had medical improvement and does not meet a listing impairment. Accordingly, the ALJ erred in finding that Batiste was not disabled.

**III.    Functional equivalent**

The ALJ erred in determining that Batiste's impairments did not functionally equal a listed impairment.

A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in marked limitations in two of the following six domains, or an extreme limitation in one domain:

(i)      Acquiring and using information;
(ii)     Attending and completing tasks;
(iii)    Interacting and relating with others;
(iv)     Moving about and manipulating objects;
(v)      Caring for yourself; and,
(vi)     Health and physical well-being.

Title 20 C.F.R. § 416.926a(b)(1)(i-vi).

A "marked" limitation in a domain means an impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities."  20 C.F.R. §416.926a(e)(2)(i).[30]

---

[30]  Title 20 C.F.R. §416.926(e)(2)(i) states as follows:
**(2) Marked limitation.**
(i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

A "marked" limitation is "more than moderate" but "less than extreme." Id. An "extreme"

limitation will be found when an impairment "interferes very seriously with [the] ability to

independently initiate, sustain, or complete activities" within a domain. 20 C.F.R.

§416.926a(e)(3).[31] An extreme limitation is "more than marked," but "does not necessarily mean

a total lack or loss of ability to function." Id. Day-to-day functioning is considered to be

seriously limited regardless of whether the impairment limits only one activity within a domain,

or several.

Here, the ALJ determined that Batiste did not have marked limitations in any of the

domains:

> In evaluating the domains as specified in the current regulations, the undersigned
> has considered all of the documentary evidence, the testimony presented, as well
> as the prior determinations made by the State Agency in arriving at his final
> determination. After reviewing the record in its entirety, the undersigned finds that
> in the first domain, "acquiring and using information," the claimant has a less than
> marked degree of limitation. Dr. Buxton, clinical psychologist, found he is
> functioning in the borderline range of intelligence. School reports indicate that
> his grades are poor and he is in resource classes. However, gradual improvement
> has been shown in his progress. He was recently promoted to the seventh grade
> and continues to qualify for special education and speech therapy. In the domain
> of "attending and completing tasks" the claimant has a less than marked degree of
> limitation. His treating physician, Dr. LaFleur and his mother, indicated that he

---

It is the equivalent of the functioning we would expect to find on standardized testing with scores
that are at least two, but less than three, standard deviations below the mean.

[31] Title 20 C.F.R. §416.926(e)(3)(i) states as follows:
    **(3) Extreme limitation.**
    (i) We will find that you have an "extreme" limitation in a domain when your impairment(s)
interferes very seriously with your ability to independently initiate, sustain, or complete activities.
Your day-to-day functioning may be very seriously limited when your impairment(s) limits only
one activity or when the interactive and cumulative effects of your impairment(s) limit several
activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme"
limitation is the rating we give to the worst limitations. However, "extreme limitation" does not
necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we
would expect to find on standardized testing with scores that are at least three standard deviations
below the mean.

was easily distracted. Dr. LaFleur also indicated that he has frequent mood swings associated with his bipolar disorder for which he is taking Lithium. His resource teacher indicated in May 2000 that he has difficulty following directions and needs frequent assistance. In the domain, "interacting and relating with others" he has no limitation. Although there is evidence that he is somewhat withdrawn, he generally is described as polite to adults and gets along well with his peers. The IEP results as well as reports from his teachers support this. In the domain, "caring for yourself," the claimant has no limitation. Although the mother testified that the claimant needs some help in his personal needs, Dr. Buxton indicated that he was "age-appropriate" in this area. None of his teachers indicated any problems in this area. In the domains, "moving about and manipulating objects" and "health and well-being" the claimant has no limitation. He alleges no physical problems and his teachers does not indicate any problems in this area. He exhibits no symptoms or physical effects from any motor functional-related impairment. He testified he plays games with his friends and likes football. He is aware of common dangers.

The two domains which are most relevant to Batiste's limitations are "acquiring and using information" and "attending and completing tasks." Batiste clearly has serious limitations in "acquiring and using information." He was placed in special education classes and speech therapy.[32] In 1999, while in the fourth grade, Batiste read and spelled at a first grade level, and performed math at a second grade level.[33] Batiste's fifth grade teacher, Lisa Scallan, completed a School Function Form, in which she noted that Batiste had difficulty with articulation, did not function at grade level, and he could only occasionally sustain complete class work timely and adequately.[34] Dr. Buxton found Batiste to have "significantly subaverage general intellect." In May, 2000, Batiste's resource teacher noted that he continued to work below grade level and that "his motivation and effort are good but his capability is weak."[35] In April, 2001, Batiste's school

---

[32] Tr. 220.

[33] Tr. 211.

[34] Tr. 244-249.

[35] Tr. 278.

notified his parents that he was failing three courses, however, in May, 2001, he was promoted to

the 7th grade by recommendation of the School Building Level Committee.[36]

The ALJ found that Batiste did not have marked impairment in his ability to acquire and

use information. The ALJ relied on Batiste's "gradual improvement," including that he was

promoted to the seventh grade. However, Batiste's promotion to 7th grade was pursuant to

committee recommendation despite his failing grades.

The evidence cited by the ALJ is not substantial in light of the evidence showing that

Batiste is learning disabled, and that despite special education services, he continues to be

seriously limited in his ability to acquire and use information. Accordingly, the undersigned

concludes that substantial evidence does not support the ALJ's determination that Batiste does

not have a marked impairment in this domain.

Likewise, the record does not support the ALJ's determination that Batiste does not have

marked limitation of function in the domain of "attending and completing tasks." The record

shows that Ms. Scallan, Batiste's teacher, noted that he could only occasionally sustain an

ordinary daily routine without special supervision.[37] Further, Ms. Scallan described him as

"easily distracted."[38] Batiste's resource teacher noted that he needed "frequent teacher

assistance" and had "difficulty in following directions."[39] Batiste's IEP required teachers to

repeat directions to him, give him preferential seating, and place him small group settings. In

---

[36]292-293.

[37] Tr. 247.

[38] Tr. 248.

[39] Tr. 278.

1999, Batiste's treating psychiatrist, Dr. LaFleur, reported that Batiste had "trouble learning, concentrating, and focusing in school," and therefore, he was prescribed Adderall for ADD.[40] In 2001, Dr. LaFleur again noted that Batiste was having "great deal of trouble concentrating in school."[41] The ALJ did not explain how Batiste's clearly significant problems with concentration did not create a marked impairment in attending and completing tasks. The undersigned finds that the ALJ's determination that Batiste did not have a marked limitation in attending and completing tasks is not supported by the evidence in the record.

As discussed above, an impairment functionally equals a listed impairment if it results in marked limitations in two domains or an extreme limitation in one domain. The record clearly shows that Batiste has a marked impairment in at least two areas. The ALJ's conclusion to the contrary is not supported by substantial evidence.

*Conclusion*

Considering the foregoing, it is recommended that the decision of the Commissioner's be **REVERSED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) days from receipt of this Report and Recommendation to file specific, written objections with the Clerk of Court. Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10)**

---

[40] Tr. 303.

[41] Tr. 259.

days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P.

6(b), shall bar an aggrieved party from attacking either the factual findings or the legal

conclusions accepted by the District Court, except upon grounds of plain error.  See

**Douglass v. United Services Automobile Association**, 79 F.3d 1415 (5th Cir.  1996).

      Signed at Lafayette, Louisiana, on February 1, 2007.


                                             _____

                                             Mildred E. Methvin
                                              United States Magistrate Judge
                                              800 Lafayette St., Suite 3500
                                              Lafayette, Louisiana 70501
                                            (337) 593-5140 (phone) 593-5155 (fax)